Most Rev. J. Carroll McCORMICK,
Bishop, Catholic Diocese of
Scranton, Plaintiff,

v.

Peter W. HIRSCH, Regional Director For
the Fourth Region, National Labor
Relations Board, Defendant,

and

Bishop Hoban Education Association, of
the Pennsylvania State Education Asso-
ciation and the National Education As-
sociation, Defendant Intervenor.

Civ. A. No. 78–968.

United States District Court,
M. D. Pennsylvania.

Nov. 3, 1978.

William B. Ball, Joseph G. Skelly, Philip J. Murren, Ball & Skelly, Harrisburg, Pa., for plaintiff.

Margery E. Lieber, Deputy Asst. Gen. Counsel for Sp. Litigation, Kathy L. Krieger, Washington, D. C., Leonard Leventhal, Regional Atty., Dorothy L. Moore, Wm. J. Green, Jr., Philadelphia, Pa., for Peter W. Hirsch.

Catherine C. O'Toole, Harrisburg, Pa., for intervenor.

## MEMORANDUM

HERMAN, District Judge.

## I. INTRODUCTION

This case raises the important First Amendment question of where the wall be-

tween church and state should be placed with respect to a non-public Catholic Church School and the National Labor Relations Board. The underlying constitutional issue is whether the National Labor Relations Board has jurisdiction over Roman Catholic schools that employ lay teachers who seek unionization. Specifically, the question now before the Court is whether a preliminary injunction should be entered enjoining the National Labor Relations Board from asserting jurisdiction over a Catholic parochial high school. After carefully reviewing the law pertaining to this Court's subject matter jurisdiction, the cases relevant to this First Amendment claim, and after applying the criteria for determining whether a preliminary injunction should issue on the facts now of record, we have concluded that the entering of a preliminary injunction is not only proper, but necessary to protect the religious freedom of this Plaintiff, the Catholic School, and those members of its religious mission; and of no less importance, to carry out the fundamental purpose of the First Amendment, by prohibiting encroachment of the government beyond the wall where entanglement and the burdening of religious liberty begins.

## II. BACKGROUND AND PROCEDURAL HISTORY [1]

Plaintiff, The Most Rev. J. Carroll McCormick, is the Bishop of The Catholic Diocese of Scranton, Pennsylvania and is the spiritual and temporal superior of all Catholic elementary and secondary schools within the Diocese. One of these schools is Bishop Hoban High School, the religious enterprise involved in this suit. The Defendant, Peter W. Hirsch, is the Regional Director for the Fourth Region of the National Labor Relations Board. Jurisdiction is asserted under 28 U.S.C. §§ 1331, 2282, and 2284, and the claims are alleged to arise under the First, Fifth and Ninth Amendments of the Constitution of the United States.

The factual background of this lawsuit began on September 15, 1978 when Bishop Hoban Education Association, PTE/NEA (hereinafter "union") filed a representation petition under Section 9 of the National Labor Relations Act, (hereinafter "NLRA"), as amended, 29 U.S.C. § 141 et seq., with the Fourth Region of the National Labor Relations Board, (hereinafter "NLRB"), seeking certification as the exclusive representative of the lay teachers employed at Bishop Hoban High School. The petition requested the NLRB to conduct an investigation and following a hearing, to direct a representation election among "all full-time and regular part-time certified, non-certified, degreed and non-degreed lay teachers, and all full-time lay guidance counselors, nurses, librarians, department heads and athletic director." On the same date the NLRB's regional office mailed to the Bishop Hoban Board of Pastors a copy of the union's petition along with a number of other NLRB documents explaining the Board's upcoming investigation and procedures.

The documents requested the prompt submission of answers to a questionnaire entitled "Interstate Commerce Data", copies of correspondence, existing or recently expired collective bargaining contracts, and an alphabetized list of employees described in the petition. The documents also requested that Plaintiff post notices on the premises of the school relating to the NLRB proceedings. On September 25, 1978 the NLRB sent a "Notice of Representation Hearing" for the representation proceeding that was scheduled for October 5, 1978. Plaintiff then filed his complaint on October 2, 1978 requesting a temporary restraining order, a preliminary and permanent injunction, and a declaration that the NLRA, as amended, is unconstitutional as applied to the Plaintiff.

After a hearing on October 3, 1978 this Court granted Plaintiff's motion for a temporary restraining order and enjoined the NLRB from conducting the representation

---

1. The findings of fact and conclusions of law as required by Rule 52(b) of the Federal Rules of Civil Procedure shall be stated throughout this memorandum in narrative form.

hearing scheduled for October 5, 1978. Defendant then sought leave to appeal pursuant to 28 U.S.C. § 1292(b) and the Third Circuit Court of Appeals denied the appeal. A hearing on the preliminary injunction was then held on October 13, 1978 and Bishop Hoban Education Association was permitted to intervene as a Defendant. Subsequently oral argument was heard on the motion for preliminary injunction on October 20, 1978.

## III. SUBJECT MATTER JURISDICTION

The first question that must be resolved is whether this Court has subject matter jurisdiction to entertain this lawsuit. Only two prior decisions have ruled on this specific issue and they have arrived at opposite conclusions.[2] In *Caulfield v. Hirsch*, (E.D.Pa. July 7, 1977) Judge Van Artsdalen held that the District Court had jurisdiction to enter a preliminary injunction and moreover, he ruled that the only other reported decision on the issue, *Grutka v. Barbour*, 549 F.2d 5 (7th Cir.), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1706, 52 L.Ed.2d 394 (1977) had been incorrectly decided. My review of these two cases leads me to believe that Judge Van Artsdalen arrived at the proper conclusion although as stated below my reasons are somewhat different and additional to those he recited in *Caulfield*.

It is true that District Courts generally do not have jurisdiction to enjoin the NLRB from conducting representation or unfair labor practice proceedings. Under Section 10 of the NLRA[3] the exclusive

means of obtaining judicial review of NLRB rulings is for the aggrieved party to seek review in the Court of Appeals after a *final* order has been entered. Final NLRB orders that are reviewable under Section 10 of the Act in the Court of Appeals do not include Board decisions in certification proceedings.[4] Therefore, an aggrieved employer must precipitate an unfair labor practice decision by the NLRB by refusing to bargain with the union's representative in order to obtain judicial relief.[5] As noted, relief lies then in the Court of Appeals and not in the District Court.[6]

The long-settled rationale for this doctrine of exhaustion is that the administrative agency must be given an opportunity to correct its alleged wrongful action. The doctrine has been generally applied to the NLRB, and proceeding through the administrative remedies of the Board is typically a prerequisite to federal jurisdiction. *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938).[7] The reasons for the exhaustion doctrine as outlined by the Supreme Court in *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) are to prevent premature interference with agency processes, to afford parties and the courts the benefit of its experience and expertise, to compile a record which is adequate for judicial review, and to afford an opportunity to correct its own errors.[8] Therefore, while there are strong policy reasons for requiring exhaustion of administrative remedies, those reasons must be analyzed in terms of their

2. Also, only two cases have met the constitutional issue, *Caulfield v. Hirsch*, No. 76–279 (E.D.Pa. July 7, 1977) and *Catholic Bishop of Chicago v. NLRB*, 559 F.2d 1112 (7th Cir. 1977). In *Caulfield*, the NLRB was permanently enjoined from asserting jurisdiction over the Roman Catholic elementary school teachers of the Archdiocese of Philadelphia. *Catholic Bishop of Chicago* likewise held that the NLRB's assertions of jurisdiction was unconstitutional.

3. 29 U.S.C. § 160.

4. *International Ass'n of Tool Crafts v. Miller*, 389 F.Supp. 1078, 1083 (D.C.), aff'd 513 F.2d 631 (6th Cir. 1975); *AFL v. NLRB*, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940); *United*

*Federation of College Teach. Loc. 1460 v. Miller*, 479 F.2d 1074 (2d Cir. 1975).

5. *Boire v. Greyhound Corp.*, 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964); *Charlie Rossi Ford, Inc. v. Price*, 564 F.2d 372 (9th Cir. 1977).

6. 29 U.S.C. § 160(e).

7. See also, *Grutka v. Barbour*, 549 F.2d 5, 7 (7th Cir. 1977); *Mayor and City Council of Baltimore v. Mathews*, 562 F.2d 914 (4th Cir. 1977).

8. See *Grutka* 549 F.2d at 8; *California ex rel. Christensen v. F. T. C.*, 549 F.2d 1321 (9th Cir. 1977); *Mayor and City Council of Baltimore v. Mathews*, 562 F.2d 914 (4th Cir. 1977).

applicability to the particular circumstances involved in this case.

The questions thus presented by the broad outline above can be stated as follows. First, does § 10 of the NLRA even apply to this case where First Amendment liberties are alleged to be infringed by any exercise of jurisdiction by the NLRB and where the question is not one of "review" of agency action? Second, do any of the well-known judicially created exceptions to the reach of Section 10; for acts of the NLRB beyond its statutory grant of authority, *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958); where swift judicial resolution is necessary to avoid international complications, *McCulloch v. Sociedad Nacional*, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963); and where Plaintiff makes a nonfrivolous assertion that the Board has deprived it of fundamental constitutional rights, *Fay v. Douds*, 172 F.2d 720 (2d Cir. 1949), apply to the issues raised here? And finally, do the exceptions to the exhaustion doctrine, where the reasons for exhaustion are inapplicable, where exhaustion would be futile, and where the agency is inherently incompetent to deal with the issue, apply to the First Amendment claim presented by the Plaintiff?

 Judge Van Artsdalen discussed the first question in Caulfield of whether Section 10 of the NLRA had any applicability to the First Amendment claims, and concluded by saying: "I . . . determined that this case was not a 'labor' case but a 'First Amendment' case [as] the court was not being asked to review a representation order or decision of the NLRB." [9] It cannot be doubted that the Plaintiff seeks to protect a prime constitutional right or that the relief he seeks is to stop at the very threshold any exercise of jurisdiction by the NLRB. That is, it is not a question that concerns certification, or the bargaining unit, or the manner of a Board-conducted election or any other matter of the administration of the NLRB for which Section 10 would control, rather, it is a question of

whether at the very first instance the NLRB should be prohibited from proceeding in any manner when that conduct would allegedly infringe basic constitutional rights. Therefore, as Judge Van Artsdalen aptly noted, the rationale of Section 10 simply does not apply where review is not sought of any agency action within its area of competence, but instead, involves a nonfrivolous colorable constitutional claim.

In this respect, I agree with Judge Van Artsdalen that *Grutka*, the only other decision dealing with precisely this issue, was incorrectly decided due to its apparent failure to appreciate the nature of the claim presented. In *Grutka* the panel treated the fundamental question of religious liberty as a question of intervention into the autonomy of the NLRB. It gave no special consideration of the First Amendment issue, rather, it adjudicated the matter as a typical "labor" case and applied the doctrine of exhaustion as developed in the labor context. Therefore, such cases as *Boire v. Greyhound Corp.*, 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964), which involved an allegation that the NLRB had erroneously assessed the facts in a certification proceeding, are not on point, nor properly controlling when the allegation of immediate unconstitutional encroachment by the government is the specific contention. By relying on the "labor" decisions and the case law developed under Section 10, we believe the *Grutka* court was wrong for the following reasons: this is not a petition for review of Board action; the rationale of Section 10 is simply not applicable to a religious liberty claim; and because it is inconceivable that Congress intended the exhaustion requirement of Section 10 to apply to a case of this nature.

In respect to the judgment of the Seventh Circuit and in assuming arguendo that Section 10 does apply to the instant case, there are two applicable exceptions which permit this Court to exercise jurisdiction.[10]

---

9. *Caulfield* at 7.

10. See, discussion of exceptions to the Section 10 exhaustion requirement in 2 A.L.R.Fed. 376 (1969).

The two exceptions applicable to the present case were developed in the leading decisions of *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 184, 3 L.Ed.2d 210 (1958) and *Fay v. Douds*, 172 F.2d 720 (2d Cir. 1949).[11]

In *Leedom v. Kyne*, the Supreme Court held that a District Court had the power to intervene in NLRB proceedings whenever the Board acted in excess of its express statutory mandate. The Supreme Court there was confronted with a situation in which the NLRB, despite a finding that one group of employees was professional and another was non-professional, nevertheless ordered an election with both groups joined in one bargaining unit. The unions that had originally represented only the professional employees brought suit to invalidate the Board's action. The suit was based on a section of the Act that expressly prohibited the joining of professional and non-professional employees in one unit without the approval of a majority of the professional employees involved.[12] Affirming the jurisdiction of the District Court, the Supreme Court stated that the action was:

"not one to 'review' in the sense of that term as used in the Act, a decision of the Board made within its jurisdiction. Rather it is one to strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the Act." [13]

The Court held that the Board's derogation of this statutory right was an "attempted exercise of power that had been specifically withheld" by Congress.[14]

The similarities between *Kyne* and the instant action are many. First, and most importantly, this is not a case to review a decision of the NLRB made within its jurisdiction.[15] It is one to stop at the threshold any action by the NLRB that would be contrary to the First Amendment. Second, if the action of the NLRB is unconstitutional, it would be per se beyond the Board's jurisdiction and in conflict with the legislative intent of the Act. Third, the exercise of jurisdiction by this Court is the only method of safeguarding the Plaintiff's rights as the alleged harm is in the NLRB taking any action, not in whatever action that may eventually result if the proceedings are permitted to continue. Last, the relief the Plaintiff seeks is from actions of the NLRB that allegedly go beyond not only its statutory authority, but beyond its constitutional power. Certainly, if the protection of any right is sufficiently extraordinary to require immediate review, it is an allegation that First Amendment Rights are on the verge of being abused. The Seventh Circuit, subsequent to *Grutka*, has conceded that "a lesser showing should be required to invoke the jurisdiction of the district courts, [when a constitutional violation is alleged]." *Squillacote v. Int'l Brotherhood of Teamsters, Local 344*, 561 F.2d 31, 38 (7th Cir. 1977).[16]

---

11. Judge Van Artsdalen also relied on a third exception developed in *McCulloch v. Sociedad Nacional*, 372 U.S. 10, 83 S.Ct. 671, 675, 9 L.Ed.2d 547 (1962) where the District Court enjoined an NLRB order requiring an election for seamen on ships flying a Honduran flag of convenience. The Supreme Court upheld the District Court's jurisdiction and relied on the national interests at stake. The court cautioned, however, that *McCulloch* was "not to be taken as an enlargement of the exception in *Kyne*," Id. at 17, 83 S.Ct. at 675. See, *Boire v. Greyhound Corp.*, 376 U.S. 473, 480, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964). While the policy elements in *McCulloch* of a compelling justification for prompt judicial resolutions are present, I find it unnecessary to ground this decision on *McCulloch* as the other two exceptions are sufficient and more specifically on point.

12. 29 U.S.C. § 159(b), (c).

13. 358 U.S. at 188, 79 S.Ct. at 184.

14. Id. at 184, 79 S.Ct. at 180. The Court also noted that the District Court action was the only remedy available.

15. As noted previously, Plaintiff is not seeking review of any representation order that would normally fall under § 10.

16. The Seventh Circuit also used language in *Catholic Bishop of Chicago v. NLRB*, 559 F.2d 1112 (7th Cir. 1977) cert. granted, 434 U.S. 1061, 98 S.Ct. 1231, 55 L.Ed.2d 760 (1978), the decision that met the merits of the constitutional challenge, that tends to show some apprehension concerning the *Grutka* holding. For example, it recognized that the "core question

The NLRB asserts that *Kyne* has no application to the instant case because no clear and mandatory provision of the statute has been violated and because in *Kyne* the District Court intervention was necessary to safeguard the employee's statutory rights since Circuit Court review was not available to them under the Act. To the first argument it is true that the NLRB has not taken action that is contrary to any specific clear or mandatory provisions of the NLRA. However, once again, it must be noted that review of agency action in violation of the NLRA is not sought here. Plaintiff does not assert that they have committed an error in administering the Act that requires review, rather, he asserts that here the Board cannot act at all. And while NLRB argues that action contrary to the constitution is not within the *Kyne* exception for conduct contrary to a statute, this simply cannot be accepted as correct. If anything, the harm caused by action contrary to the Constitution is more pronounced than that of exceeding statutory mandates. On this point the Seventh Circuit's opinion in *Squillacote* is again instructive. The court said: "we see no reason why constitutional claims should be treated less favorably than statutory claims . . . Moreover, if § 10 were construed as a total bar on the assertion of constitutional claims in the district court, questions concerning that section's constitutionality might arise." [17]

Even without the alleged constitutional violation, there are serious questions of whether the NLRB is exceeding the jurisdiction granted by Congress. Plaintiff persuasively argues that Congress never entertained the notion that the NLRA should apply to church schools as is evidenced by the text of the Act; the complete absence of a record evidencing an intent to regulate church schools; and in the presumed intention of the Congress to enact constitutional legislation. Of course, ultimately resolving the issue presented here on statutory grounds would avoid deciding the constitutional issue as is the preferred approach.[18] Regardless of what this Court's final determination will be on the granting or denial of the permanent injunction, the close question of whether the NLRB is exceeding the grant of jurisdiction under the NLRA adds to our conclusion that the *Kyne* exception applies to the instant case.

The text of the NLRA and the legislative history shows that Congress most likely did not contemplate the Act's applicability to Catholic parochial schools. The purpose of the Act was to avoid industrial strife and obstructions to the free flow of commerce. Outside of the fact that the commerce clause was not interpreted to be so sweeping at the time of the passage of the Act,[19] it is obvious from the testimony and other evidence now before this Court that the Act could at best only apply awkwardly to religious schools.[20]

The crux of this question is whether the definition of employer in the Act [21] includes religious institutions. The House version of the Taft-Hartly Act would have excluded from the definition of employer religious entities.[22] The reasons for the failure to

. . . is whether the Board's exercise of jurisdiction over the schools constitutes an improper breaching of the separation wall" and stated that the issue was "sufficiently extraordinary" to require the court to analyze the Board's jurisdictional standard. Id. at 1118.

**17.** *Squillacote v. Int'l Broth. of Teamsters*, 561 F.2d 31, 37, n. 11 (7th Cir. 1977).

**18.** See *U. S. v. CIO*, 335 U.S. 106, 68 S.Ct. 1349, 92 L.Ed. 1849 (1947); *Ashwander v. TVA*, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936).

**19.** See, *Carter v. Carter Coal Co.*, 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936).

**20.** See *Burns v. Alcala*, 420 U.S. 575, 95 S.Ct. 1180, 43 L.Ed.2d 469 (1975) where the Supreme Court explained that awkward construction of language would not be applied.

**21.** 29 U.S.C. § 152(2).

**22.** HR3020, 80th Cong., 1st Sess. 4 (1947), reprinted in 1 NLRB, Legislative History of the Labor Management Relations Act, 1947, at 34 (1948). See also discussion in Comment, the Free Exercise Clause, the NLR, and Parochial School Teachers, 126 U.Pa.L.Rev. 631, 639 (1978).

specifically exclude religious enterprises appears, however, in the House Conference Report as follows:

"The other non-profit organizations excluded under the House bill are not specifically excluded in the conference agreement, for *only in exceptional circumstances and in connection with purely commercial activities* of such organizations have any of the activities of such organizations or of their employees been considered as affecting commerce so as to bring them within the scope of the Act." [23]

Certainly from the language, there is a strong indication that Congress did not perceive the Act as applying to religious institutions.

The rules of statutory construction also arguably point to the conclusion that "employers" as used in the Act does not include religious institutions. In the landmark case of *Church of the Holy Trinity v. United States*, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892) the Supreme Court held that if a literal construction of the words of a statute would lead to an absurd, unjust, nonintended result, the statute must be construed as to avoid the result.[24] In that case the federal government attempted to apply to a church a federal statute prohibiting the importation of aliens under contract or agreement to perform labor or service in the United States. The church had made a contract with an English pastor to come to the United States and enter into service for the church. On the basis of the contract, the United States sued the church for penalties prescribed by an alien labor law. While conceding that the contract was within the literal language of the statute, the court concluded that Congress could not have intended the result of prohibiting a church from hiring an English pastor.

█ The Court said "a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers," [25] and that a statute which "comprehends all things in the letter" may be construed "to extend to but some things." [26] By looking at the title for guidance and the evils that Congress sought to remedy, it concluded the statute was not intended to cover ministers. Moreover, the Court said: "But, beyond all these matters, no purpose of action against religion can be imputed to any *legislation* . . .." [27] In the present case, similar questions are raised as to the scope of the NLRA because of the purpose of the Act, the evil sought to be remedied, and the likely infringement of religious liberty to which the attention of Congress was not directed.[28]

Considering these two elements, that a possible constitutional violation of the First Amendment is greater justification for District Court intervention than the statutory right involved in *Kyne* and the strong indications that the NLRB, if allowed to proceed with the representation proceeding, would be acting beyond the grant of power given by Congress in the Act, it appears clear that the rationale for the *Kyne* exception would permit this Court to proceed under these extraordinary circumstances.[29]

---

**23.** HR Rep.No.510, 80th Cong., 1st Sess. 32 (1947), *reprinted in* 1 NLRB, Legislative History of the Labor Management Act 1947, at 536 (1948).

**24.** Id. at 461.

**25.** Id. at 459, 12 S.Ct. at 512.

**26.** Id.

**27.** Id. at 465, 12 S.Ct. at 514.

**28.** Congress is, of course, presumed to have acted within the bounds of the Constitution in enacting legislation, *Kent v. Dulles*, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) and where as here, the danger of infringing religious liberty was not considered, this supports the interpretation that the statute was not intended to reach religious enterprises. See, *Ralpho v. Bell*, 186 U.S.App.D.C. 397, 569 F.2d 636 (1977).

**29.** Many courts have noted that when an agency acts in defiance of its statutory authorization the District Courts do not have to wait for the underlying proceedings to run their course. Instead, the Federal Courts can intervene to preserve the status quo and prevent the infringement of substantial rights that might otherwise be sacrificed. See e. g., *Mayor and City of Baltimore v. Mathews*, 562 F.2d 914 (4th Cir. 1977); *State of California ex rel. Christensen v. FTC*, 549 F.2d 1321 (9th Cir. 1977).

■ The second argument raised by the Defendant NLRB, that *Kyne* requires that no other judicial remedy be available, is similarly unpersuasive in the context of this case. To say that judicial review is ultimately available at the circuit level is to overlook the essence of the Plaintiff's claim that by the time such review could be had, religious liberties would have already been infringed. Also, review at that stage is not even possible unless the Catholic church commits a violation of law, an unfair labor practice. The mere continuation of the certification process under Section 9 of the Act is what is alleged to be unconstitutional.[30] Merely proceeding with the certification process allegedly would burden the church by requiring it to disclose financial information, would permit the NLRB to determine the appropriate bargaining unit within the religious institution, would require the posting of notices in the church school, would inhibit the Bishop's now sole authority to manage the school and would enable the NLRB to begin to exercise its extremely broad investigating powers under Section 11,[31] to name but some of the areas that allegedly would lead to a burden on free religious activities and entanglement.

To require such an important constitutional question to remain undecided during a protracted NLRB proceeding; to require such precious liberties to perhaps be temporarily lost during the interim before judicial relief, when such relief is only available when the church commits an unfair labor practice, would be totally inconsistent with the great importance with which we view our First Amendment rights. The *only* available relief consistent with the importance of the rights is for the Court to exercise its jurisdiction now. This exercise therefore is well within the limits of the *Kyne* exception to Section 10, as circuit court review, although ultimately available on the commission of an unlawful act, is *not adequate.*

■ The second exception to Section 10, which is even more controlling that *Kyne,* is the doctrine laid down in *Fay v. Douds,* 172 F.2d 720 (2d Cir. 1949) by Judge Learned Hand, that a District Court has jurisdiction if the "assertion of a constitutional right is not transparently frivolous." [32] Although not specifically noted by the Supreme Court in *Boire v. Greyhound Corp.,* 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964),[33] the doctrine that a claim of denial of prime constitutional rights can be asserted by an action in District Courts notwithstanding Section 10 of the Act has been acknowledged frequently by the courts.[34] While

---

30. 29 U.S.C. § 159(b).

31. 29 U.S.C. § 161. Section 11 provides in part:

"The Board, . . . shall . . . have access to, . . . and the right to copy any evidence of any person being investigated or proceeded against that relates to any matter under investigation or in question. The Board shall upon application of any party to such proceedings, forthwith issue to such party subpoenas requiring the attendance and testimony of witnesses or the production of any evidence in such proceeding on investigation requested in such application."

As noted in the background section, *supra,* these requests for information have already begun. Also, a subpoena duces tecum has been issued to one of the church school's administrators requiring the production of all documents indicating the amount of annual budget for the last four years and copies of all documents pertaining to purchasing, electric bills, etc., for the past four years.

32. Id. at 723.

33. *Fay* was understandably not cited in *Boire* along with *Kyne* and *McCulloch* as Justice Stewart was specifically referring to the Supreme Court decisions that permitted District Court "review" of orders entered in certification proceedings.

34. See e. g., *United Federation of College Teachers, Local 1460 v. Miller,* 479 F.2d 1074, 1080 (2d Cir. 1973); *International Ass'n of Tool Crafts v. Miller,* 389 F.Supp. 1078 (E.D.Tenn. 1974); *New York Mercantile Exch. v. Commodity Futures,* 443 F.Supp. 326 (S.D.N.Y. 1977); *Ralpho v. Bell,* 186 U.S.App.D.C. 397, 569 F.2d 636 (1977); *Association of Nat. Advertisers, Inc. v. FTC,* 565 F.2d 237 (2d Cir. 1977); *Groendyke Transport, Inc. v. Davis,* 406 F.2d 1158 (5th Cir. 1969); *Squillacote v. Int'l Broth. of Teamsters,* 561 F.2d 31 (7th Cir. 1977); *Barnes v. Chatterton,* 515 F.2d 916 (3d Cir. 1975); *Exxon Corp. v. FTC,* 411 F.Supp. 1362 (D.Del.1976).

Defendant, NLRB relies on *Firestone Tire & Rubber v. Samoff,* 365 F.2d 625 (3d Cir. 1966)

the "not transparently frivolous" test of *Fay* is now more properly framed in terms of a substantial showing by the Plaintiff that his constitutional rights will be infringed by agency action, the Plaintiff in the instant case is well within any recent judicial narrowing of the exception. That is, while mere allegations of constitutional deprivations may not be sufficient to vest jurisdiction in the District Court,[35] a clearly colorable claim, as in the present case, is sufficient to require the District Court to intervene to protect constitutional rights. Therefore, due to the substantial showing the Plaintiff has made that his constitutional rights will be infringed by the exercise of any jurisdiction on the part of the NLRB, we find that it is proper to exercise jurisdiction irrespective of Section 10 of the Act.[36]

It should be noted that the *Grutka* decision assumed that "a district court could enjoin an exercise of Board jurisdiction which was unconstitutional as a matter of law,"[37] however, because it found that a factual record was essential to the adjudication of the constitutional claims it required exhaustion of administrative proceedings. Since the Board has no expertise in developing a factual record for a constitutional adjudication, this rationale is seriously questionable. More specifically on the applicability of *Fay*, it held that *Fay* did not apply as Bishop Grutka was "not asserting

a vested property right with respect to a collective bargaining agreement . . ."[38] Being mindful of the development of the law during the past one hundred years, such an assertion that property rights take precedence over fundamental First Amendment rights cannot be accepted as an accurate statement of law.[39] At the least, this is not a sufficient reason for us to discard *Fay* in the instant case.

■ Other doctrines also point to the propriety of the exercise of jurisdiction here. Foremost is the doctrine that exhaustion is not required when the purposes of the doctrine are not served. The *Caulfield* opinion[40] quoting from *United States ex rel. Marrero v. Warden*, 483 F.2d 656, 659 (3d Cir. 1973) stated the:

"basic premises underlying the exhaustion requirement are that (1) judicial review may be facilitated by allowing the appropriate agency to develop a factual record and apply its expertise (2) judicial time may be conserved because the agency might grant the relief sought, and (3) administrative autonomy requires that an agency be given an opportunity to correct its own errors.

■ In the instant action, no expertise of the NLRB in administering the Act

---

for the proposition that constitutional claims do not provide such extraordinary circumstances as to require immediate District Court attention. That case, however, did not involve fundamental First Amendment issues that do make the claims of "extraordinary" proposition. See, *Catholic Bishop of Chicago v. NLRB*, 559 F.2d at 1118. Also the *Barnes* decision subsequently recognized the *Fay* exception as noted above.

**35.** See, e. g., *International Ass'n of Tool Crafts v. Miller*, 389 F.Supp. 1078 (D.C.), aff'd without opinion 513 F.2d 531 (6th Cir. 1975); *United Federation of College Teach., Local 1460 v. Miller*, 479 F.2d 1074 (2d Cir. 1973).

**36.** *In Barnes v. Chatterton*, 515 F.2d 916 (3d Cir. 1975) the court stated "[a] party need not await a final agency decision if the preliminary agency decision clearly and unambiguously violates statutory or constitutional rights" Id. at

920. While there is not a final agency decision as yet, as will be developed later in the text, the futility of obtaining a decision is perfectly clear and the showing of likely infringement of First Amendment rights is both substantial and of immediate nature.

**37.** 549 F.2d at 8.

**38.** 549 F.2d at 9, n. 7. See, *Squillacote v. Int'l Broth. of Teamsters*, 561 F.2d 31, 38 (7th Cir. 1977).

**39.** See, *Wisconsin v. Yoder*, 406 U.S. 205, 213, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15 (1972) where the Supreme Court states the protection of religious liberty was so essential to override even those public interests at "the very apex of a function of a State".

**40.** *Caulfield* at 11.

is required for resolution of the constitutional challenge which deals with the sensitive area of the religion clauses of the First Amendment. In fact, "Adjudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies." *Oestereich v. Selective Service Board No. 11,* 393 U.S. 233, 242, 89 S.Ct. 414, 419, 21 L.Ed.2d 402 (Harlan, J., concurring).[41] The second purpose will likewise not be served as the Board has summarily ruled at least seven times that it has jurisdiction over religious schools[42] and nothing has been shown that would indicate that any further attempt to present the constitutional argument would not be likewise futile. Moreover, the NLRB's jurisdictional test which only exempts "completely religious" schools[43] is not a workable guide,[44] nor is it really a test at all as any showing of instruction on secular subjects is treated as a presumption of NLRB jurisdiction.[45] Therefore, there is simply no reason for requiring the Plaintiff to submit to the NLRB proceeding when the ultimate result is inevitable.[46] Also, as Judge Van Artsdalen noted, the desire to prevent litigious interruptions of on-going administrative processes is not applicable as the Plaintiff does not seek to interrupt, but rather to stop any action ab initio. In sum, the policy of requiring exhaustion of administrative remedies is obviously not in any way applicable to the present case.

Therefore, on the basis that this is not a Section 10 case; that the exceptions to the Section 10 are applicable if it *does* apply; and that none of the policies of exhaustion are present, I am convinced, as Judge Van Artsdalen was, that this Court has jurisdiction over the subject matter of this case.

## IV. STANDARD FOR PRELIMINARY INJUNCTIONS

■ The availability of injunctive relief is dependent upon a consideration of four factors: (1) the significance of the threat of irreparable harm to the Plaintiff if the injunction is not granted, (2) the absence of substantial harm to other interested parties, (3) the public interest, and (4) the likelihood that the Plaintiff will prevail on the merits of his case.[47] After considering these various factors, I have found that they are heavily weighted in favor of the Plaintiff's motion and a preliminary injunction will thus be entered.

### A. IRREPARABLE HARM

■ Irreparable harm is, of course, a prerequisite for the issuance of a preliminary injunction.[48] To be irreparable the harm must be immediate and likely. Mere speculative injury is not sufficient.[49] What

---

41. See also, *Public Utilities Commission of California v. United States,* 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958); *Weinberger v. Salfi,* 422 U.S. 749, 765, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *Barnes v. Chatterton,* 515 F.2d 916 (3d Cir. 1975).

42. See, e. g., *Roman Catholic Archdiocese of Baltimore,* 216 NLRB 249 (1975); *Catholic Bishop of Chicago,* 220 NLRB 359 (1975); *Archdiocese of Philadelphia,* 227 NLRB No. 177 (1977).

43. See, e. g., *Roman Catholic Archdiocese of Baltimore,* 216 NLRB 249 (1975); *Archdiocese of Philadelphia,* 227 NLRB 177 (1977).

44. *Catholic Bishop of Chicago v. NLRB,* 559 F.2d 1112, 1118 (7th Cir. 1977).

45. See, Comment, The Free Exercise Clause, the NLRA, and Parochial Schools Teachers, 126 U.Pa.L.Rev. 631, 634–35 (1978).

46. Judge Van Artsdalen in *Caulfield* described the Plaintiff's position as being "doomed from the outset" at 11.

Futility of proceeding with the administrative action is a well-documented exception to the exhaustion requirement. See e. g., *Glover v. St. Louis-San Francisco Railway Co.,* 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969); *Wolff v. Selective Service Local Board No. 16,* 372 F.2d 817 (2d Cir. 1967). Especially this is the case where serious threats to the exercise of First Amendment rights is presented.

47. *Nelson v. Miller,* 373 F.2d 474 (3d Cir.) cert. denied 387 U.S. 924, 87 S.Ct. 2042, 18 L.Ed.2d 980 (1967).

48. See, *National Land & Investment Co. v. Specter,* 428 F.2d 91 (3d Cir. 1970).

49. See, *A.L.K. Corp. v. Columbia Pictures Industries, Inc.,* 440 F.2d 761 (3d Cir. 1971).

is irreparable varies from case to case and there are no set guidelines in terms of financial harm, delay, or damage to personal rights that can be carried from one case and applied in another. There are, however, some general rules that help to define what is irreparable.

One of these is the general rule that "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."[50] For example, in *Bannercraft Clothing Company v. Renegotiation Board,* 151 U.S.App.D.C. 174, 185, 466 F.2d 345, 356 (1972) the court said: "And of course, if an administrative body threatens invasion of important substantive rights, an equity court need not stand helplessly by until the damage has been done."[51] This language is specifically applicable to the present case as the charge of threatened deprivation of First Amendment rights goes to any exercise of jurisdiction by the NLRB.

*Public Funds for Public Schools v. Marburger,* 358 F.Supp. 29 (D.N.J.1973) aff'd 417 U.S. 961, 94 S.Ct. 3163, 41 L.Ed.2d 1134 (1974) is similarly indicative of the general rule that the "deprivation of such a fundamental constitutional right constitutes irreparable harm".[52] *Marburger* involved an establishment clause question of entanglement and a preliminary injunction was granted to stop further involvement of the sovereign in the religious activities of church schools. As the court in *Marburger* properly found, the threatened deprivation of rights guaranteed by the establishment and free exercise clauses of the First Amendment is per se irreparable harm for the purposes of granting a preliminary injunction.

In the instant case, Plaintiff has made a substantial showing that his First Amendment rights will be infringed if an injunction is not entered. The beginnings

of entanglement and restraint of free exercise rights would start immediately on the institution of the certification proceeding. Such a strong showing of threatened constitutional deprivations is more than sufficient to be categorized as "irreparable harm". Even if this were not the case, the financial and time consuming burden of going forward in the representation proceeding would be irreparable harm.

Defendant relies on *National Land & Investment Company v. Specter,* 428 F.2d 91 (3d Cir. 1970) and *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) for the proposition that injunctive relief is not proper on the mere invocation of the First Amendment when proceedings are brought in good faith. These two cases, however, are in no way applicable to the present one. There is no attempt being made to interfere with on-going state proceedings. What is sought by the Plaintiff is simply to prohibit the start of any governmental proceeding that would intrude on religious freedom. Likewise, Defendant's assertion that "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury"[53] although a correct statement of law, is not applicable as Plaintiff contends the harm is not the expense of submitting to a proceeding, but the unconstitutionality of the proceeding itself.

### B. ABSENCE OF SUBSTANTIAL HARM TO OTHER INTERESTED PARTIES

In considering the harm that will be caused the NLRB and the union, it is necessary to balance their alleged harm against that of Plaintiff's irreparable harm already described above. The NLRB alleges that a preliminary injunction at this stage will seriously interfere with the Board's performance of its responsibilities under the Act and impair the interest of

---

**50.** Wright and Miller, Federal Practice and Procedure § 2948, at 440.

**51.** Id. 151 U.S.App.D.C. at 185, 466 F.2d at 356.

**52.** Id. at 43. Citing *Lewis v. Kugler,* 446 F.2d 1343, 1350 (3d Cir. 1971); *Schnell v. City of*

*Chicago,* 407 F.2d 1084, 1086 (7th Cir. 1969); *Green v. Kennedy,* 309 F.Supp. 1127, 1139 (D.D.C.1970) and others as authority.

**53.** *Renegotiation Board v. Bannercraft Clothing Co., Inc.,* 415 U.S. 1, 24, 94 S.Ct. 1028, 1040, 39 L.Ed.2d 123 (1974).

those who have invoked the Board's orderly processes and jeopardize the public interest. The union asserts that it will run the grave risk of loss of support that delay might cause. In considering these arguments, I have found that the threatened hardship to the Plaintiff is more substantial than that suggested by the Defendants.

As to the Defendant NLRB's argument that it cannot fulfill its functions under the Act, the answer is that the Board has no proper functions with respect to religious schools. Only two cases have met this exact issue, *Caulfield* and *Catholic Bishop of Chicago*, and both have held in strong language that the NLRB has absolutely no jurisdiction with respect to Catholic church schools and that any attempted exercise of jurisdiction is in violation of the First Amendment. The union's claim has little more merit because it too cannot be aided by the continuation of the NLRB proceedings. This is so because, until the constitutional controversy is resolved, neither the union nor the lay employees will be able to reap any benefits.

For example, in *Caulfield* the NLRB was permitted to proceed with the certification process and an election was ordered. Judge Van Artsdalen, after a hearing, preliminarily enjoined any further administrative action, including the holding of an election. Mr. Justice Brennan on the petition of the United States Solicitor General then modified the prior injunction by allowing the election to proceed among lay teachers, however, pursuant to the order, the votes were to be impounded pending final disposition of the appeals by the Third Circuit. Justice Brennan's order was entered on May 19, 1977 and to this day the votes remain impounded and uncounted. That the same result would occur in the present case if an election were held is inevitable. Therefore in reality, the union and the lay employees are not harmed by retaining the status quo until the constitutional issue is resolved.

## C. PUBLIC INTEREST

When the protection of First Amendment liberties are involved, little else need be said of balancing the public interest, as protection of these rights is the most fundamental.[54] Certainly, the policies of the NLRA are of great importance and effective in carrying out the public interest, but they cannot be said to be paramount when weighed against the abridgement of the First Amendment and the United States Constitution. If the NLRB were permitted to proceed and an election was ordered, the disruption in the community from these events would certainly be great. The devisiveness it would likely cause in the religious school community and the likely confrontations between the church hierarchy, union, and teachers, both lay and religious, point to keeping the status quo intact until the constitutional question is answered.

## D. PROBABILITY OF SUCCESS ON THE MERITS

Even without the consideration of the other three factors mentioned above, the overwhelming showing that the Plaintiff has made that he will ultimately prevail on the merits would lead me to conclude that the NLRB should be preliminarily enjoined from taking any further action with respect to the representation petition until the constitutional question can be finally resolved. The reason for this is that First Amendment rights must be vigorously guarded and once a showing of likely success has been made, the irreparable harm that could flow from the continuation of the threatening proceeding requires that it be stopped at the threshold before the infringement of First Amendment rights occurs.[55] The showing that the Plaintiff has

---

54. See, *Marburger*, 358 F.Supp. at 43.

55. *Catholic Bishop of Chicago* stated "We find ourselves, however, in agreement with the employers' contention that the *very threshold act of certification* of the union necessarily alters and impinges upon the religious character of all parochial schools." 559 F.2d at 1123. (Emphasis added.) Under that court's rationale and others such as *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) which hold that *potential* constitutional infringements must be halted, it is far more reasonable to conclude that the threshold is at the

made does not rest only on the two cases that have specifically held in favor of his position, but also on the long line of Supreme Court decisions that have interpreted and given flesh to the two religious clauses of the First Amendment. Therefore, unless the Supreme Court breaks from the substance of their past opinions, it seems to us that the Court in all likelihood will find in favor of the *Catholic Bishop of Chicago* in the case now pending before it.[56]

In discussing the probability of success on the merits it is of course necessary to first make clear the constitutional analysis that is applicable. The First Amendment to the United States Constitution reads in relevant part that, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . .."[57] In the instant case, both the free exercise clause and the establishment clause are implicated by the constitutional arguments presented by the Plaintiff. Significantly, *Caulfield* and *Catholic Bishop of Chicago* similarly held that both clauses would be violated if the NLRB were allowed to proceed with its attempted exercise of jurisdiction. Thus whether the wall is described as high and impregnable[58] or blurred and indistinct,[59] it is clear that these two courts found that the exercise of jurisdiction by the NLRB was within the unconstitutional area reserved for religious freedom.

The constitutional analysis under the two separate clauses, although now recognized as doctrines that overlap,[60] has been given a framework by recent Supreme Court announcements. Free exercise analysis involves a three step test as utilized in *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). First, it must be determined that a legitimate religious belief is held by the Plaintiff or under the facts of this case that the religious school of Bishop Hoban is pervasively religious. Second, inquiry must be made whether the free exercise rights of the Plaintiff would be either burdened or inhibited by the exercise of jurisdiction by the NLRB. Last, if an affirmative answer is arrived at by the second inquiry, the government must show that the burdening of rights is justified by a compelling state interest.

The recent establishment cases[61] show that the applicable analysis is in essence a factual inquiry into the degree of entanglement that would result from governmental action.[62] The cumulative criteria suggested by Chief Justice Burger in the decision of *Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) however, more specifically are, (1) whether the statute has a secular legislative purpose,[63] (2) whether its principal or primary effect is one that neither advances nor inhibits reli-

---

point where unconstitutional acts are alleged to first occur.

**56.** Certiorari was accepted in *NLRB v. Catholic Bishop of Chicago*, on February 21, 1978, 434 U.S. 1061, 98 S.Ct. 1231, 55 L.Ed.2d 760 and the case is scheduled for argument on October 30, 1978. See 47 U.S.L.W. 3274–75, Oct. 27, 1978.

**57.** For the historical background of the First Amendment, See e. g., *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1946); *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 86 L.Ed. 601 (1962); *Walz v. Tax Commission*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).

**58.** *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

**59.** *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

**60.** See, *Abington School Dist. v. Schempp*, 374 U.S. 203, 222, 83 S.Ct. 1590, 10 L.Ed.2d 844 (1963).

**61.** See e. g., *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *Committee for Public Education v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); *Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952).

**62.** See, *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) with respect to factual record that is sufficient to make the constitutional determination.

**63.** See, *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); *Engel v.*

gion,[64] and (3) whether the relationship would foster "excessive government entanglement with religion".[65] The Court in applying this test has shown a particular concern and has *sought to avoid* "active involvement of the sovereign in religious activities,[66] the risks inherent in programs that bring about an administrative relationship between public bodies and church-sponsored schools,[67] governmental evaluation and standards with respect to religious practices,[68] any kind of day-to-day relationship between church and state,[69] extensive investigation into church operations or finances,[70] any sustained or detailed administrative relationship for enforcement of statutory or administrative standard,[71] inherent difficulties in the combination of religious discipline and the possibility of disagreement between teacher and religious authorities over the meaning of statutory restrictions,[72] and the entanglement of government in difficult classifications of what is or is not religious.[73] The listing of these suspect areas of entanglement illustrates the kinds of involvement with a church entity that will simply not be tolerated. The potential involvement of the NLRB, as will be shown, enters not just one of these suspect areas, but possibly all of them.

### a. FREE EXERCISE

The Plaintiff's claim implicating the free exercise clause is that the application of the NLRA to the religious school will interfere with and burden the exercise of his religion and moreover burden the religious liberty of the church. Under the *Yoder* analysis,

his claim evidences a great likelihood of success.

First, it cannot be seriously doubted that Catholic schools in Pennsylvania are an integral part of the religious mission of the church. At the hearing held on this matter, extensive evidence was offered to show the pervasive religious character of the institutions. For example, testimony was presented that Catholic education is an expression of the mission entrusted by Jesus to the church he founded, that the mission of the Catholic schools is to teach Christian values, that the school is a community of faith serving its purpose of preparing the students for the service of God, and that the Catholic faith and morals permeate and pervade the whole school. The profoundly religious character of the Pennsylvania Catholic schools has been described by the Supreme Court as follows:

> "[T]he fact that the secular education those schools provide goes hand in hand with the religious mission that is the only reason for the schools' existence. Within the institution, the two are inextricably intertwined.[74]

In fact as Plaintiff correctly notes, the Supreme Court in *Lemon* and *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975) held that the schools were such an integral part of the religious mission that they could not be the recipients of any public funds. The Seventh Circuit understandingly noted Plaintiff's argument that the Board's action, in consistently ruling that it has jurisdiction over Catholic schools,[75] was "cruelly whip-sawing their

Vitale, 370 U.S. 421, 82 S.Ct. 1261, 86 L.Ed. 601 (1962).

**64.** Citing, *Board of Education v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968).

**65.** Citing, *Walz v. Tax Commission*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).

**66.** *Walz v. Tax Commission*, 397 U.S. 664, 668, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).

**67.** Id. at 672, 90 S.Ct. 1409.

**68.** Id. at 674, 90 S.Ct. 1409.

**69.** Id.

**70.** Id. at 691, 90 S.C. 1409.

**71.** Id. at 675, 90 S.Ct. 1409.

**72.** *Lemon*, 403 U.S. at 619, 91 S.Ct. 2105.

**73.** *Walz*, 397 U.S. at 698, 90 S.Ct. 1409.

**74.** *Lemon*, 403 U.S. at 657, 91 S.Ct. 2105, 2133.

**75.** As noted, *supra*, the NLRB applies a per se rule that Catholic schools are within its statutory jurisdiction by applying the "completely religious" test that is directly contrary to Supreme Court decisions.

schools by holding that institutions too religious to receive governmental assistance are not religious enough to be excluded from its regulation." [76]

The extent of tne Board's encroachment can further be illustrated by the Supreme Court references to the religious mission of the Catholic school. In fact, the Supreme Court's definition of the schools is that it is the church itself. The Pennsylvania Catholic schools, like Bishop Hoban, have been described as an integral part of the religious mission, religious enterprises, and as institutions that have an atmosphere in which religious instruction and religious vocations play a part in the educational function.[77] Thus for the NLRB to hold that such religious institutions are not religious enough to be exempted from the NLRA is at first glance hard to understand. The obvious purpose behind the per se rule is to avoid the constitutional doctrine that the religious mission of the Catholic school cannot be defined by the sovereign, that is, it would be proceeding on unconstitutional ground once it entered the morass of evaluating the religious nature of the schools based on religious practices.[78]

The second part of the analysis, whether free exercise liberties are being either burdened or inhibited, requires this Court to determine if the exercise of jurisdiction by the NLRB would have the effect of interfering with either religious beliefs or practices.[79] Since both the *Caulfield* and *Catholic Bishop of Chicago* cases have listed in detail the areas of conflict or burdening of Plaintiff's rights, only some of the more obvious factors will be discussed here. Generally, these areas that burden or inhibit the religious practices and management of the Bishop Hoban school also involve entan-glement problems as will be mentioned later. In surveying these areas of possible unconstitutional action by the NLRB, the Court is mindful of the Supreme Court warning that even the "potential" burdening of religious liberties is sufficient to prohibit further involvement.[80]

The areas of possible conflict with the First Amendment due to the NLRB's powers under the NLRA include at least the following. Under Section 9(b) of the NLRA, the Board is empowered to determine what would be an appropriate bargaining unit within the religious community of the school.[81] By Section 10 the NLRB could force the church to engage in collective bargaining with respect to wages, hours, and all terms and conditions of employment.[82] By Section 11 the Board is granted broad investigating powers with respect to both the certification process and unfair labor practice matters which include investigation into the financial affairs of the church. Finally, by Section 10, the Board would be required to determine whether allegations of unfair labor practices were based on either anti-unions sentiment or religious doctrine.

In the representation proceedings the NLRB is responsible for investigating questions of representation, conducting elections and for certifying the results. The determination of the appropriate bargaining unit in a church raises the constitutional issue as the Catholic school is considered a single community of faith. In separating the facility into two discrete and possibly conflicting camps of lay and religious, devisiveness between the lay and religious members seems inevitable. The Supreme Court has stated that division along religious lines

**76.** *Catholic Bishop of Chicago*, 559 F.2d at 1119.

**77.** See *Meek*, 421 U.S. at 396, 95 S.Ct. 1753; *Lemon*, 403 U.S. at 613–18, 91 S.Ct. 2105.

**78.** See, *United States v. Ballard*, 322 U.S. 78, 87, 64 S.Ct. 882, 88 L.Ed. 1148 (1944); *Presbyterian Church v. Mary Elizabeth Blue Hull Presbyterian Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969); *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952).

**79.** The Supreme Court in *Walz v. Tax Commission*, 397 U.S. at 669, 90 S.Ct. at 1412 stated "Each value judgment under the Religion Clauses must therefore turn on whether particular acts in question are intended to establish or interfere with religious beliefs and practices or have the effect of doing so."

**80.** *Lemon*, 403 U.S. at 620, 91 S.Ct. 2105.

**81.** 29 U.S.C. § 159(b).

**82.** 29 U.S.C. § 160.

was one of the principal evils against which the First Amendment was intended to protect, and further that difficulties inherent in the possibility of disagreement between teacher and religious authorities over the meaning of the statutory restrictions should be avoided.[83] Even the very determination of the appropriate unit involves the NLRB in making a decision that concerns the internal structure of the church school and the management relationship which is contrary to prior case law.[84]

Probably the greatest potential effect involves the enforcement of the good faith bargaining requirement to "terms and conditions" of employment.[85] Within the scope of term and conditions, such matters as workloads and employee discipline, and curriculum are subject to mandatory collective bargaining.[86] In *Lemon*, the Supreme Court recognized that lay teachers are under the religious control and discipline of the religious authority that necessarily pervades the school system.[87] For the NLRB to enter this zone which has been always considered inseparable from the religious mission of the church school is thus to inhibit and burden what has been considered ecclesiastical concerns.

In *Catholic Bishop of Chicago* the court explained "[n]o longer would the bishop be the sole repository of authority as required by church law," if the Board is permitted to exercise jurisdiction, the bishop would have "to share" some decision-making with the union and, as a practical matter, must [then] consult the lay faculty's representative on all matters bearing upon the employment arrangement."[88] As one scholar has observed:

"Once a bargaining agent has the weight of statutory certification behind it, a familiar process comes into play. First, the matters of salaries is linked to the matter of workload; workload is then related directly to class size, class size to range of offerings, and range of offerings to curricular policy. Dispute over class size may also lead to bargaining over admission policies. This transmutation of academic policy into employment terms is not inevitable, but it is quite likely to occur.[89]

This potential for requiring the church to bargain on issues that go to the very heart of church doctrine and its mission is concern for alarm. For example, if the union desired the curriculum to be restructured to eliminate formal courses devoted to religion, the Bishop would be required to bargain, or if he "should refuse to renew all lay faculty teacher contracts because he believed that the union had adopted policies and practices at odds with the religious character of the institutions . . . he might well be found guilty of an unfair labor practice."[90] As Judge Van Artsdalen stated, the "crux of the problem is that the terms and conditions of employment at some point become inseparable from the religious mission of the church schools."[91]

Even more perplexing is that if the church would refuse to bargain about actions taken on what is alleged to be strictly religious grounds, the NLRB would be placed in the untenable and unconstitutional position of determining if the church's objections to bargaining were religiously based or due to anti-union animus and second, whether the grounds relied on by the church were applicable to the bargaining question. The NLRB would thus enter the unconstitutional thicket of determining what is the religious doctrine and whether the doctrine applies under the circumstanc-

**83.** *Lemon*, 403 U.S. at 619, 622, 91 S.Ct. 2105.

**84.** See, *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976).

**85.** 29 U.S.C. § 158(a), (d).

**86.** *Caulfield* at 26.

**87.** *Lemon*, 403 U.S. at 617, 91 S.Ct. 2105.

**88.** *Catholic Bishop of Chicago*, 559 F.2d at 1123.

**89.** *Brown v. Collective Bargaining in Higher Education*, 67 Mich.L.Rev. 1067, 1175 (1969), quoted also in *Catholic Bishop of Chicago* at 1123.

**90.** *Catholic Bishop of Chicago*, 559 F.2d at 1123.

**91.** *Caulfield* at 29.

es to exempt the church from the bargaining requirement.[92]

Under the Board's broad investigation powers it could enter areas already marked off by the Supreme Court as unconstitutional involvement. For example, in *Walz* the court warned against "extensive state investigation into church operations and finances",[93] and governmental evaluation of church actions.[94] Yet, the NLRB has already sought the budget and other financial information from Bishop Hoban and it has not even begun to exercise the broad powers of investigations ultimately at its disposal. The Section 11 powers as quoted previously,[95] leave little beyond the NLRB's reach. Judge Van Artsdalen discussed this broad authority in great detail and specifically pointed to the possible great intrusions into the internal affairs of the employer in representative matters. The reach of the investigatory powers into the financial affairs of the church obviously create the potential for breach of religious liberty.

The problems that can occur under Section 8(a)(1) which reads that it shall be an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by Section 7" which include, to organize, join a union, and to bargain collectively, were noted by the Seventh Circuit. The Court discussed the "chilling" aspect that would inhibit the church in the employment relationship by referring to a case where it was alleged the employer violated the section by "reciting . . . a prayer entitled 'Repent Ye Sinful Children', and in reading aloud . . . the General Epistle of St. James, Chapter 4, Verses 1–10"[96] to a group of employees. While eventually dismissed by the Administrative Law Judge, it was only so dismissed after "Three days of testimony and 531 pages of transcript".[97] For the church officials to have to fear such charges from prayers made in the religious schools and to have the NLRB inquire about the beliefs of the employer, as to his either religious or anti-union purpose, evidences the unconstitutional nature of proceedings under 8(a)(1).

Section 8(a)(3) states it is an unfair labor practice for an employer to discriminate in regard to hiring or tenure of employment for the purpose of encouraging or discouraging union membership.[98] In a myriad of situations, such as dismissing a teacher for teaching a doctrine at odds with the tenets of the Roman Catholic faith, or for adopting a lifestyle contrary to Catholic moral teachings,[99] the Board would be empowered to determine if a firing was for union or ecclesiastical concern. As previously noted, the NLRB cannot constitutionally enter into determining such matters of what is church doctrine and whether it applies.[100]

Thus after reviewing the action that has already been begun by the NLRB and its numerous powers that lay in wait for the religious schools, it is more than reasonable

92. See, *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952); *Presbyterian Church v. Mary Elizabeth Blue Hull Presbyterian Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969).

93. *Walz*, 397 U.S. at 691, 90 S.Ct. at 1423 (Brennan, J. concurring).

94. *Walz*, 397 U.S. at 674, 90 S.Ct. at 1414.

95. Supra at 14.

96. *Catholic Bishop of Chicago*, 559 F.2d at 1126.

97. Id.

98. 29 U.S.C. § 158(a)(3).

99. See *Catholic Bishop of Chicago*, 559 F.2d at 1125.

100. See, *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) (Civil courts are prohibited from resolving ecclesiastical disputes such as determining if church conduct is consistent with church law); See, e. g., *Diocese of Fort Wayne-South Bend, Inc.*, (Case Nos. 25–CA 7932, 7932–27932–3) (1977) (discussed in *Catholic Bishop of Chicago* at 1125) as an example of the Board's approach when religious justifications are offered for employment decisions and the Board's attempted avoidance of dealing with the religious questions. In both 8(a)(1) and 8(a)(3), the determination of whether a violation has occurred depends upon the employer's motive, *NLRB v. Brown*, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); *NLRB v. Eagle Material Handling, Inc.*, 558 F.2d 160, 169 (3d Cir. 1977), which thus requires the Board to entertain questions involving religious conduct and doctrines.

to say that religious liberties will be infringed if the Board is permitted to act in the normal fashion. Judge Van Artsdalen succinctly made the point:

> "The special circumstances surrounding the religious mission of these parish schools, the relationship of lay teachers with their pastor, religious teachers, and fellow lay teachers, the inseparable intertwining of factors such as curriculum and teacher discipline with the religious missions of the school, and the pervasive authority of the NLRB over the employment area, persuade me that an interference with religious activity has occurred, and that further interference is inevitable." [101]

The final factor that must be considered under the *Yoder* analysis is whether the government's interest is sufficiently compelling as to override the conflicting First Amendment right. A compelling state interest in the First Amendment context was explained in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) as follows: "in this highly sensitive constitutional area [o]nly the gravest abuses, endangering paramount interests, give occasions for permissible limitations." [102] That this showing must be extremely great was evidenced in *Yoder* when the court held that religious liberty overrode even the educational practices of the state that was considered to "rank at the very apex of the function of a State".[103] The showing the NLRB has made is less than that presented in *Yoder* and therefore their interest in attempting to extend the NLRA into areas not even considered by Congress cannot be said to be compelling, if it is even reasonable.

Defendants rely on a number of cases in which compelling state interests were obviously present. They cite *Reynolds v. Unit-*

ed States, 98 U.S. 145 (1878) where the court upheld a statutory ban on polygamy and *Prince v. Massachusetts*, 321 U.S. 158 (1944) where the government's purpose of protecting children from burdensome and exploitative labor was held to be compelling. Such matters as police, fire, and wage laws are simply of a different order than the interest the government offers here. Also, the harm to the Plaintiff, and the Catholic church as an *institution* [104] is so great and direct that an extraordinary showing of interest on the part of the NLRB would be needed to outweigh these interests.

In *Prince*, the strong parens patriae role of the state was present, and in *Reynolds* the strong tradition of monogamous marriages and the prevention of the exploitation of women were offered by the state, but here no such strong interest is presented and no historical justification exists for the NLRB to enter the religious institutions. These considerations of history and the public's perception of the NLRB's actions are important in determining where the public interest lies.[105] Most importantly, however, is that none of the regulating cases cited by the Defendants intrude on religious liberty as the NLRB would here, with its extensive investigating powers, and other proceedings that would require it to enter upon questions right at the heart of the religious mission of the church. In short no compelling interest sufficient to justify the intrusion upon free exercise has been shown.

**b. ESTABLISHMENT CLAUSE**

Following the analysis suggested by Chief Justice Burger in *Lemon*, and subsequent establishment cases [106] three areas are relevant to the inquiry of whether the establishment clause is being abused. First,

---

**101.** *Caulfield* at 27.

**102.** Id at 406, 83 S.Ct. at 1795.

**103.** *Yoder*, 406 U.S. at 213, 92 S.Ct. at 1532.

**104.** See *Catholic Bishop of Chicago* at 1172–23. See *Yoder* with respect to harming the institution of the church, 406 U.S. at 212, 92 S.Ct. 1526.

**105.** See *Walz*, 397 U.S. at 673–78, 90 S.Ct. at 1413–1416.

**106.** See, e. g., *Roemer v. Bd. of Public Works*, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976); *Wolman v. Walter*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977).

regardless of the secular purpose of the NLRB, it does not justify infringement of religious liberty if the secular purpose or religious blindness still has the infirm effect.[107] From the description of the powers of the NLRB in the above discussion, nothing more need be said here as to the likely harm to the church that would be caused by the Board's intrusion upon areas such as the religious running of the institution. The effect would be both direct and substantial and the end result would be a policy that inhibits religion. What will be briefly referred to here is the third area of unconstitutional involvement: entanglement.

■ The Supreme Court has often recently sought to condemn excessive entanglement between church and state and has made it clear that the mere potential is sufficient to stop any further involvement.[108] It cautioned against governmental involvement with churches on a day-to-day basis and of any governmental examination of religious actions in *Walz*.[109] In *Lemon* it stated a classic warning against "programs, whose very nature is apt to entangle the state in details of administration" and with concern noted the potential for entanglements arising from governmental intervention in the employment relationship where religious authority necessarily pervades.[110] The basic premise to be derived from these entanglement cases is that secular and religious authorities should not and cannot constitutionally interfere with the other's respective sphere of autonomy.

The kind of entanglement involved in the instant case is administrative entanglement which requires analysis on the institutional interference between church and state and moreover, requires strict scrutiny of the extent of the intrusion into the spiritual realm. Unconstitutional administrative entanglement has been chartered in two distinct lines of "doctrinal development: first, excessive government surveillance of religious institutions and personnel; and second, government resolution of internal religious dispute".[111] One constitutional scholar describes the two types of administrative entanglement as follows:

"In the first form of forbidden administrative entanglement, government insinuates itself coercively into religious life, . . . . State inspection and evaluation of the religious content of a religious organization creates a relationship pregnant with dangers of excessive government direction of church schools and hence of churches.[112]

But however serious is this first type of administrative entanglement, the form of entanglement the Supreme Court deems most subversive of First Amendment values is that which involves government not only in the *apparatus* of religion but in its very *spirit* —in its decisions on core matters of belief and ritual." [113]

If the NLRB were allowed to exercise its jurisdiction over religious institutions it would breach not just one but both strands of administrative entanglement. The first branch would be violated by the excessive involvement by the NLRB with the internal workings of the *religious community* of the school, which *Lemon* denotes as being the church itself, and its scrutiny of the financial affairs of the church. If the union would become certified, the entanglement would heighten as it would then sit in judgment over management decisions made by the church. The second and most clearly forbidden entanglement would occur when the NLRB determines the appropriate bar-

---

107. See, *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

108. See, *Tilton v. Richardson*, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971); *Walz v. Tax Commission*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975).

109. *Walz*, 397 U.S. at 674, 90 S.Ct. 1409.

110. *Lemon*, 403 U.S. at 615, 617, 91 S.Ct. 2105.

111. L. Tribe, *American Constitutional Law*, 869–70 (1978).

112. Quoting from *Lemon*, 403 U.S. at 620, 91 S.Ct. 2105.

113. L. Tribe, *American Constitutional Law*, 870 (1978).

gaining unit within a school or within a diocese and when unfair labor practices would be adjudicated by the Board. As beforehand noted, in these the NLRB would have to decide the nature of the religious doctrine, the intent of the school administrator, and decide if union sentiment or religious doctrine was the real motive of a decision assertedly made on religious grounds. To avoid such confrontation and entanglement between church and state was the very purpose for the First Amendment.

In short, the NLRA gives the Board authority to investigate all aspects of the school's employment practices, make administrative determinations with respect to the lawfulness of those practices,[114] order that such practices as it deems to violate the Act be remedied, and enforce its remedial orders against the church in courts of law. It would have the authority to inspect and analyze financial data of the church, to compel disclosure of similar data in the course of collective bargaining, to investigate and analyze the motivations of religious personnel in connection with terminations, hirings, discipline, and other allegedly discriminating actions taken by them. The cumulative effect of these entanglements and others noted previously leave no doubt that the governmental power will infringe on religion and thus conflict with the religion clauses. Since the potential for entanglement is far more present here than that condemned in *Lemon*, the likelihood of ultimate success on the merits has been shown.

## V. CONCLUSION

While the lay employees at Bishop Hoban High School may fail to understand or feel unjustly harmed by the decision herein made that the Board must be prohibited from further action by the issuance of a preliminary injunction, their economic plight is not the issue before this Court. As the Supreme Court said in *Lemon*:

"The sole question is whether state aid to these schools can be squared with the dictates of the Religious Clauses. Under our system the choice has been made that government is to be entirely excluded from the area of religious instruction . . . lines must be drawn."[115]

In the instant case, the sole question is whether a preliminary injunction must be issued to protect the religious liberties of the Plaintiff and the church, not whether the lay teachers are underpaid or any other matter of the employment relationship. The Constitution decrees that the liberties of the Plaintiff be upheld and protected.

An order has therefore been entered on October 30, 1978 granting the preliminary injunction for the Plaintiff on the basis that his constitutional rights could be irreparably harmed if the NLRB were permitted to proceed, that the Defendants will not be harmed substantially by maintaining the status quo, that the public interest lies with the Plaintiff and the continued vitality of the First Amendment, and that the Plaintiff has shown that he will in all likelihood prevail on the constitutional merits.

114. See *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) in which a state court set aside a Bishop's defrockment because it was arbitrary. The Supreme Court reversed holding that any analysis of church action to determine whether it was consistent with church laws as "exactly the inquiry that the First Amendment prohib-its" Id at 713, 96 S.Ct. at 2382. "[A] civil court must accept the ecclesiastical decisions of church tribunals as it finds them." Id.

Specifically it stated that "questions of church discipline" ousted the civil courts of jurisdiction. Id at 717, 96 S.Ct. 2372. Certainly the NLRB cannot avoid these doctrines.

115. *Lemon*, 403 U.S. at 625, 91 S.Ct. at 2117.