KOCHER COAL COMPANY, a corporation, and Samuel F. Klinger, Plaintiffs,

v.

Ray MARSHALL, Secretary, U.S. Department of Labor, Robert B. Lagather, Assistant Secretary of Labor of the Mine Safety & Health Administration, John B. Shutack, District Manager, MSHA Coal Mine Safety & Health District 1, Samuel M. Blumberg, Jr., RPR, Charles C. Klinger, Inspector, MSHA Coal Mine Safety & Health District 1, Defendants.

Civ. A. No. 80–1110.

United States District Court,
E. D. Pennsylvania.

March 25, 1980.

Mark N. Savit, Bruce A. McDonald, Cotten, Day & Doyle, Washington, D. C., for plaintiffs.

Alan Yamamoto, Atty., U. S. Dept. of Labor, Washington, D. C., for defendants.

BENCH OPINION

TROUTMAN, District Judge.

The plaintiffs appear here today seeking injunctive relief and a declaratory judg-

ment that the defendants acted unlawfully in securing possession of transcripts of secret grand jury proceedings, using information therefrom to investigate an accident which occurred at the plaintiff's mine, and issuing citations and orders exposing plaintiffs to liability in the sum of some $70,000.

The Plaintiff Kocher Coal Company, a Pennsylvania corporation with its principal place of business in Valley View, Pennsylvania, mines, processes and markets coal for use as fuel.

Plaintiff Klinger is a general mine foreman for the Kocher Coal Company.

The Defendant Marshall is the Secretary of Labor; the defendant Lagather, the Assistant Secretary of Labor of the Mine Safety & Health Administration, referred to as MSHA; defendant Shutack is the district manager of MSHA Coal Mine Safety & Health District Number One; and defendant Klinger is an inspector therewith.

MSHA, a component agency of the Department of Labor established by the Federal Mine Safety and Health Act of 1977, 30 United States Code Section 801 et seq., promulgates mandatory standards to protect the health and safety of miners and requires that operators of mines and all miners comply with such standards.

On March 1, 1977, part of the coal company's Valley View mine, known as the Porter Tunnel Mine, flooded. As a result, it is alleged that nine miners died, three suffered serious injuries, and one remained trapped in the mine for five days.

Subsequently, MSHA instituted an administrative investigation of the accident. In June 1977 MSHA held a public hearing in Tower City. The hearing panel included employees of MSHA, the Pennsylvania Department of Environmental Resources, either as a member of the panel or assisting therein, a trial attorney from the Department of the Interior, and an Assistant Attorney General of the Commonwealth of Pennsylvania.

During the course of the hearing the Interior Department attorney commented that conflicting testimony presented at the hearing indicated to him that perjury had been committed, and, therefore, that he would recommend to the Department of Justice that an investigation be commenced to verify his suspicion.

It appears at the very threshold to be an unusual, if not an extraordinary, procedure to have an attorney in a civil proceeding threaten perjury charges at such public proceeding, considering the number of civil proceedings in which there is from time to time and most generally a conflict of testimony.

Consequently, and apparently as a result of his statement, the Department of Justice convened a grand jury, which heard testimony relating to the matter. Apparently the grand jury refused to return a true bill, for the Department of Justice did not prosecute or produce indictments or informations against the plaintiffs.

In September 1979 MSHA commenced an ex parte proceeding, and obtained an order from Judge Pollak of this District to obtain access to the transcripts of the grand jury proceedings.

In February 1980 Defendant Shutack, the MSHA district manager, issued citations alleging violations of the Act and exposing plaintiffs to civil penalties.

Plaintiffs allege that defendants issued these citations on the basis of information contained in the notes of the grand jury proceedings.

Plaintiffs also allege that the defendants have advised them that MSHA will issue and publish a report pursuant to 30 United States Code Section 813(d) regarding the Porter Tunnel Mine accident, and that the report will contain and make public information contained in the grand jury transcripts.

Plaintiffs, therefore, urge us to declare that defendants' use of and reliance on information contained in the grand jury transcripts in issuing the citations and orders were unlawful and abusive of the secrecy surrounding the grand jury proceedings, and that, therefore, the citations and orders are void.

Plaintiffs also ask us to declare that defendants' action in revealing the contents of the grand jury transcripts is similarly unlawful, and that all administrative proceedings initiated or to be initiated based on information contained in the transcripts are unlawful.

Finally, plaintiffs also asked us to enjoin defendants from viewing, reviewing, disclosing, or publishing the contents of the grand jury transcripts.

With this factual background in mind, we turn now to the legal standards which must necessarily guide us in making our decision. The Court of Appeals has ruled that for a plaintiff to obtain a preliminary injunction he must, and we quote:

"... must demonstrate that irreparable injury will occur if relief is not granted to maintain the status quo until a final adjudication on the merits can be made and that there is a reasonable probability of eventual success on the merits. In addition, the court must weigh the possibility of harm to the non–moving party as well as to any other interested persons and, when relevant, harm to the public."

We here refer to the case of *The Continental Group, Inc. v. Amoco Chemicals Corporation,* 614 F.2d 351 (3rd Cir. 1980). The standard for granting relief against agency abuse is no different. And we here cite *McCormick v. Hirsch,* 460 F.Supp. 1337 (M.D.Pa.1978).

First, we find that plaintiffs will suffer immediate and irreparable injury in the absence of injunctive relief. Normally, when administrative agencies make factual determinations, persons who may be adversely affected by these decisions are afforded an opportunity to contest the accuracy of these facts. An adjudicatory hearing provides procedural safeguards to prevent findings which are arbitrary and capricious.

However, the functioning of the grand jury proceeding is much different. In order to investigate criminal activity, the grand jury has formidable powers. To encourage voluntary testimony and to protect innocent people, the grand jury deliberates without informing the person upon whom the investigation focuses, and does not allow that person to participate in the proceedings.

█ Absent a true bill, the accused remains uninformed as to the proceedings, has no knowledge as to who appeared and their testimony to the grand jury, and is not entitled to such information. However, once the grand jury acts and finds a true bill of indictment, the accused receives the right to a trial by his peers to determine the veracity of the charges brought against him.

In sharp contrast here, to the extent that the civil penalties, here imposed, are based on the grand jury proceedings, plaintiffs have had no opportunity to contest the basis of the administrative citations, which expose plaintiffs to substantial civil penalties.

Importantly for our purposes here, these citations create a premise under Section 104(d) of the Federal Mine Safety and Health Act of 1977 upon which further findings of unwarranted failure to comply with safety and health standards may result in the termination of operations on the plaintiffs' premises. That fact alone may give rise to irreparable harm. And we here call attention to the case of *Bituminous Coal Operators Association v. Secretary of the Interior,* 547 F.2d 240 (4th Cir. 1977).

Plaintiffs will also suffer irreparable injury if the defendants publish the accident report based on information from the grand jury's secret proceedings. The fact that plaintiffs, or more particularly, certain of plaintiffs' employees, were the object of a grand jury investigation will then be public and published information, a result diametrically opposed to one anticipated by the purpose of grand jury secrecy.

Accordingly, we find that irreparable injury will occur if relief is not granted to maintain the status quo until a final adjudication on the merits can be made.

█ Turning now to the second standard which plaintiffs must meet, we find and conclude that there exists a strong likelihood of plaintiffs succeeding on the merits when a final adjudication is made. Even

assuming that the grand jury transcripts were released properly, the propriety of breaching the secrecy of grand jury proceedings by publishing all or part thereof under any circumstances is difficult to legally justify. And, separate and apart from this consideration is the unfairness of allowing defendants to assimilate and act upon information contained in the transcripts, and at the same time refusing access to the plaintiffs. This discrepancy on its face suggests that absent prior remedies, such as the vacation of the original order and the complete sterilization of defendants' findings, plaintiffs are likely to succeed in their efforts to obtain information used by the defendants. Accordingly, we find that plaintiffs have a strong likelihood of succeeding on the merits.

Turning to the third and final standard, we must weigh the possibility of harm to the defendants as well as to the public if we issue the injunction. Clearly, enjoining publication of defendants' report will not harm defendants substantially, for if defendants succeed on the merits, the harm to them will be merely a delay in the publication of their report. Issuing the injunction will not harm the public. In fact, refusing to issue the injunction may harm the public, for "the public has an interest in maintaining the secrecy of the grand jury," because, and we here quote:

"... the grand jury is the direct, independent representative of the people as a whole rather than those brought before it. The application of secrecy to its proceedings is a safeguard for the grand jury itself, because it tends to prevent it from being used as an instrument for explorations in aid of civil proceedings."

*In re April 1956 Term Grand Jury*, 239 F.2d 263 (7th Cir. 1956).

Dissemination of secret grand jury materials to the public contravenes the purposes of making and keeping grand jury proceedings secret. Those purposes include insuring the utmost freedom to the grand jury in its deliberations, preventing persons subject to indictment or their friends from importuning the grand jurors, preventing subor-

nation of perjury or tampering with witnesses who may testify before the grand jury at a later trial, encouraging free and untrammeled disclosures by persons who have information concerning committed crimes, and protecting innocent people accused, but later exonerated, from disclosure of the fact that an investigation against them had been conducted. *United States v. Procter & Gamble*, 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958).

Those policies will be undermined, if not destroyed, if regulatory agencies, routinely or even occasionally, include in published reports notes of grand jury testimony or information directly or even indirectly derived therefrom.

■ The fact that the grand jury which investigated plaintiffs is no longer in session does not alter this result at all, and we here quote:

"... for in considering the effects of disclosure on grand jury proceedings, courts must consider not only the immediate effects of disclosure on grand jury proceedings but also the possible effect upon the functioning of future grand juries. Persons called upon to testify will consider the likelihood that their testimony may one day be disclosed to outside parties. Fear of future retribution or social stigma may act as a powerful deterrent to those who would come forward and aid the grand jury in the performance of its duties. Concern as to the future consequences of frank and full testimony is heightened where the witness is an employee of a company under investigation. Thus, the interests in grand jury secrecy, although reduced, are not eliminated merely because the grand jury has ended its activities."

This forceful language directly applicable to the facts of this case is found in *Douglas Oil Company v. Petrol Stops Northwest*, 441 U.S. 211, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979). Accordingly we find that the detriment to the public and the absence of any substantial harm to defendants warrant the issuance of a preliminary injunction.

An appropriate order will be entered.

In reaching our conclusion, we have, as previously stated, assumed that the grand jury transcripts were properly released by Judge Pollak. Advised, as we are, that an application has been made to Judge Pollak to vacate that original order, it becomes immediately apparent that the question thus raised before him becomes a threshold issue in this case, because if that original order is vacated, all that followed may become a nullity, and the plaintiffs may there obtain all the relief that they seek here.

Whether the information given to Judge Pollak was full and complete remains to be determined. Whether he was fully informed remains to be determined. When he released the grand jury transcript to the defendants, was he aware of the fact that such testimony was to be used for the purpose of civil citations involving more than $70,000?

Was he aware of the possibility that such proceedings could result in the ultimate closing of the plaintiffs' mining operation?

Was he aware of the fact that the attorney for the Government agency involved instigated, suggested or requested the grand jury proceedings, and that the agency or its successor may then have intended to use such grand jury testimony, and allegedly did use such testimony, against the plaintiffs, under circumstances where the plaintiffs had no access thereto, depriving them of any defenses available from such testimony?

Did he intend that a governmental agency may instigate, suggest or request a grand jury investigation and then exclusively use the fruits thereof for its own purposes?

Did he anticipate the totality of circumstances which have occurred, particularly as they affect the plaintiffs here, and was he given sufficient information from which to foresee such developments?

Was he aware of the potential use of the grand jury notes and testimony by the agency for the purpose of making a public report?

It is one thing for a government agency to conduct a public hearing and make a public report. It is another for such agency to terminate a public hearing with the threat of perjury, initiate a grand jury investigation through proper channels, obtain exclusive access to the secret proceedings of the grand jury, and then use the results of those secret proceedings for the purpose of making a public report thus making public that which is secret.

Thus stated, the result appears to be unacceptable. Even worse is the fact that the agency may thus select only those portions of such secret proceedings as support its results and its conclusions, at the same time depriving the affected party or parties access to any portion of such proceedings favorable to or supporting its or their cause. Thus stated, such result appears totally unacceptable.

To suggest that such apparent inequities and injustices are remedied by authorizing a like release of grand jury information to the affected parties, as some would suggest, is to completely eliminate grand jury secrecy. Such result will undoubtedly bring the federal criminal justice system, as presently constituted, to a gradual halt. Certainly witnesses will not freely or otherwise appear, and the grand jury will likely be rendered impotent.

If, as previously noted, "the grand jury is the direct, independent representative of the people as a whole," and if it is not to be "used as an instrument for explorations in aid of civil proceedings," it would appear that this ex parte application for release of grand jury records for civil purposes must be carefully scrutinized, the ultimate and perhaps far–reaching impact thereof fully and completely determined before allowing disclosure. It is doubtful that this was done in this case or could have been done in the course of an ex parte application. It is doubtful, indeed, that it could be done in any case.

The problems and results involved suggest that the historical rule, which prevailed from the inception of the grand jury system, was correct, and that grand jury rec-

ords and proceedings in connection with criminal investigation should be used only for continued criminal investigation and the pursuit of crime, as opposed to anything civil, including civil investigations, citations and penalties, no matter how well they may be motivated or good–intentioned.

Our observations suggest the problems with which Judge Pollak will be faced in determining whether to vacate his original order. If vacated for any reason, it is likely that Judge Pollak will then seek to sterilize what has since occurred. In so doing, he may render moot the need for continued injunctive relief.

Accordingly, as previously stated, we shall issue a preliminary injunction as sought by the plaintiffs. Having done so, we shall respectfully suggest that counsel then pursue before Judge Pollak the motion to vacate the order or orders entered by him releasing the grand jury materials to the defendants. Thereafter, if there is a continued need for a permanent injunction, you may return to this court for that purpose.

In the alternative, if in the application before him Judge Pollak foresees evidentiary hearings such as would overlap the subsequent hearing or hearings on the permanent injunction before this court, we shall, on request, assign this case to him in the interest of conserving time, judicial resources, and unnecessary expense and inconvenience to the litigants.

In that connection, we have noted that the assignment sheets with reference to the case before us contain several questions which relate to assignment of related cases.

Question No. 1: Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?

The answer to that was "yes."

2: Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?

Answer, "Yes."

Those two answers would, under normal circumstances, have automatically resulted in the assignment of this matter to Judge Pollak as a related case. However, grand jury proceedings and the release of transcripts thereof are sufficiently unique that it may have been the considered conclusion of the clerk that nothing, but nothing, should be assigned in this case to Judge Pollak as related to a grand jury proceeding. This we do not know.

Certainly we do know that in our experience the assignment of a civil matter such as this as being related to a grand jury proceeding is without precedent. In this case, however, it does appear that there is a complete, if not a substantial, overlap, and we shall to that extent await the further advice of counsel and/or Judge Pollak, as the case may be.